UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 06-80943-CIV-MARRA/JOHNSON

THE ESTATE OF JOHN GARCZYNSKI

      Plaintiff

vs.

SHERIFF RIC BRADSHAW (PBSO), officially
DEPUTY ROB-ROY WITHROW (PBSO), individually
DEPUTY DANA MACLEOD (PBSO), individually
DEPUTY SHAWN GODDARD (PBSO), individually
OFFICER ROBERT ADAMS (BRPD), individually[1]
SERGEANT ROBERT SANDT (PBSO), individually and
DEPUTY JONATHAN WILDOVE (PBSO), individually

      Defendants.

_____/

**OPINION AND ORDER**

      THIS CAUSE is before the Court upon Defendants' Motion For Summary

Judgement [DE 70].  The motion is fully briefed and ripe for review.  The Court has

carefully considered all the filings, including the notices of supplemental authority

and of filing evidence, and oral argument of counsel.

**Background**

      Plaintiff filed an Amended Complaint asserting claims against the Sheriff of the

Palm Beach County Sheriff's Office ("PBSO") in his official capacity, and against

Deputy Rob Withrow (PBSO) ("Withrow"), Deputy Dana MacLeod (PBSO) ("MacLeod"),

_____

[1]  Robert Adams has been voluntarily dismissed from this action.

Deputy Shawn Goddard (PBSO) ("Goddard"), Sergeant Robert Sandt (PBSO) ("Sandt"),

Deputy Jonathan Wildove (PBSO), ("Wildove"), and Officer Robert Adams ("Adams")

from the Boca Raton Police Department, individually for violations of the Fourth and

Fourteenth Amendments of the United States Constitution under 42 U.S.C. § 1983

(Counts I - VII), for common law assault and battery (Count VIII), and for common law

negligence (Count IX) [DE 57-2].

The Defendants seek entry of summary judgment in their favor on all claims

based upon their contention that there are no disputed questions of material fact.

<u>Facts</u>

The facts, as culled from the depositions and documentary evidence, in a light

most favorable to the nonmovant for purposes of this motion, are as follows:

On March 9, 2005, Leigh Garczynski ("Leigh") went bowling with her husband

John Garczynski ("Garczynski").  Although they were separated, they remained

friendly and bowled together regularly.  Leigh depo. at 21-22.  Leigh explained that

they liked being around each other, they still spent time together, exchanged

Christmas presents, and Garczynski's two boys (from a prior marriage) did not know of

the separation because she did not want them to know.  Leigh depo. at 21-22.

After bowling, Garczynski gave Leigh a large envelope.  Leigh depo. at 28-29.

Garczynski told her, "don't open it until something happens."  Leigh depo. at 32.

Leigh did not wait and opened the envelope once Garczynski had driven off.  Leigh

depo. at 32.  Garczynski was driving his 2003 Ford Explorer XLT.  Included in the

envelope were Garczynski's last will and testament, an obituary which listed the date of death as that same day, March 9, 2005, a journal, and a letter to Garczynski's mother.  Leigh depo. at 57.  Leigh interpreted these papers to indicate that Garczynski was suicidal.  Leigh depo. at 32.  On the way home, Leigh called Garczynski on his cell phone.  Leigh depo. at 35.  Leigh pleaded with Garczynski to meet her, he refused; both were crying while on the phone.  Leigh depo. at 36.  Garczynski's potential suicidal intentions were centered on his depression over the estrangement from Leigh.  Leigh depo. at 59; Sandt Depo. at 21-23.  During this conversation, Garczynski told Leigh he had a gun.  Leigh depo. at 35-36.  When Leigh arrived home, she called 911 and asked for help with suicide prevention.  Leigh depo. at 39; Sandt Depo. at 21.

Subsequently Deputy Wildove and other Sheriff's deputies arrived at Leigh's house.  When Wildove and Sergeant Sandt came into the house, Leigh showed them the papers she received from Garczynski earlier that evening.  Leigh depo. at 48. Leigh had told the 911 operator and Wildove that Garczynski had a gun.  Leigh depo. at 57.  Leigh was asked about Garczynski:  Had he ever been violent?  She responded that he never was.  Leigh depo. at 45.  Did he have military experience?  Leigh responded that he had held an administrative position in the Navy.  Leigh depo. at 45.

At about 9:30 p.m., Garczynski called Leigh.  Leigh depo. at 48.  Garczynski stayed on the phone with Leigh from around 9:30 p.m. until 1:10 a.m., three hours and forty minutes, except for a brief time when he had to switch phone batteries.

Leigh depo. at 48-49.  During this time, deputies attempted to locate Garczynski using cellular tower triangulation.  DE 84-54 at 5; Wildove depo. at 41; Goddard depo. at 13.

Wildove monitored the entire conversation between Leigh and Garczynski and he was aware of the substance and mood of the conversation.  Leigh depo. at 53; Sandt Depo. at 32.  The tone of the conversation was calm.  Wildove depo. at 20. While the tone of the conversation would have been important, Sandt, the Sergeant in charge of the operation until Lieutenant Hart took over much later, did not instruct Wildove to communicate the tone of the conversation to him.  Sandt Depo. at 35. Wildove did not consider Garczynski's calm state of mind an important fact to relay. Wildove depo. at 31.  Wildove's sole purpose in monitoring the conversation was to determine Garczynski's location.  Wildove depo. at 21, 23-24.  Wildove's only responsibility was to relay important information to Sandt so Sandt could relay it to the deputies in the field.  Wildove depo. at 25.  Sandt was the only person in radio contact with the officers on the scene.  Wildove depo. at 26.

In the beginning of their conversation, Garczynski and Leigh discussed Garczynski's suicidal ideation.  By the middle of their conversation, they began to speak about routine topics and about the possibility of reconciliation.  Leigh depo. at 59; Wildove depo. at 27.

Wildove instructed Leigh to find out where Garczynski was and what he was wearing.  Leigh depo. at 50-51.  At first, Garczynski did not tell Leigh his location.  By the middle of the conversation, Garczynski told Leigh he was at the beach, and that

she would know.  Leigh depo. at 54.  Since they had gone to a beach just over the

bridge of Spanish River Boulevard on their second date, she surmised this was where

Garczynski was located.  Leigh depo. at 54.  Leigh conveyed the information to

Wildove.  Leigh depo. at 54-55.  Leigh did not tell Garczynski that the police were

looking for him because Wildove told her not to let him know.  Leigh depo. at 55.

Leigh recalled that Sandt came over to the door and spoke with Wildove.  Leigh

depo. at 62.  They thought they had located Garczynski, but later said: "No, wrong

guy."  Leigh depo. at 62.

At 12:33 a.m., Garczynski's vehicle was found by Withrow in the parking lot of

an apartment complex.  DE 84-54 at 5.  McLeod, Withrow, Goddard and Adams

gathered to plan an approach when he returned to his car.  Sandt was formulating

plans to make a "safe" approach utilizing a ballistic shield.  MacLeod depo. at 29-30.

At 12:43 a.m., Withrow said to Sandt, "It's your call.  My suggestion, we get [ballistic]

shield[s] before we approach this vehicle.  Vehicle in real bad spot.  We got stop sticks

out in front of vehicle."  Sandt Depo. at 43.  Sandt arranged to have a ballastic shield

brought to the scene.  Sandt Depo. at 44.  Stop sticks, effective in deflating tires,

were at the egress points of the parking lot.  Sandt depo. at 55.  Sandt had requested

a helicopter, but was unable to get one.  Sandt Depo. at 43.  Sandt also requested a

canine officer.  Sandt Depo. at 44.  The Boca Raton Police Department was controlling

traffic around the place where Garczynski was located.   Sandt Depo. at 45.

Eventually, Sandt arranged for the fire department to "stage" nearby.  Sandt Depo. at

45.  Sandt never requested  deployment of one of the officers trained in crisis intervention because he did not feel it was appropriate to have anyone else involved until the officers had made physical contact with Garczynski.  Sandt Depo. at 45-47. Bringing in a crisis intervention specialist to communicate with Garczynski would have jeopardized the covertness of their operation.  Sandt Depo. at 85.

Leigh was instructed to "get him to his car, get him to his car."  Leigh depo. at 62.  This was done so the police would know for certain where Garczynski was located. Leigh depo. at 62-63; Hart depo. at 43.  Leigh convinced Garczynski to go to his car in order for him to get warm.  Leigh depo. at 62-63.

At 1:08 a.m., Sandt informed his officers that Garczynski was on his way to his car.  Sandt Depo. at 48.  Sandt learned this fact from Wildove who had been monitoring the conversation between Leigh and Garczynski.  Sandt Depo. at 48-49. The officers at the scene hid themselves from Garczynski's view.  MacLeod depo. at 32.  At approximately 1:09 a.m., MacLeod saw Garczynski entering his SUV as a result of a dome light going on.  Sandt Depo. at 62.

Wildove told Leigh: "Have him start his car."  Wildove accompanied the statement with a gesture of a key being turned in the ignition of a car.[2]  Leigh depo. at 67-68.  Leigh confirmed Garczynski was in his vehicle when she asked him where he

---

[2]  Viewing the evidence in a light most favorable to Plaintiff, the Court disregards Wildove's contention that he never instructed Leigh to get Garczynski into get to his car or start the engine.

was and he responded by asking her if she could hear the seatbelt warning bell go off.

Leigh depo. at 63.  When asked whether she had heard the engine of Garczynski's SUV

starting, Leigh responded:

> I don't recall hearing the engine starting, but I know he would have to
> start the engine for the seatbelts, and I actually – I, from Wildove's
> direction, gave him directions to start the engine.

Leigh depo. at 66.

Garczynski was in the vehicle for 16 seconds before he started his car and the

officers approached.  Sandt Depo. at 68-69.  The safe approach plan which involved

waiting for the ballistic shield was abandoned once Garczynski started his vehicle.

MacLeod depo. at 36-37; Goddard depo. at 36.  It was never communicated to Hart,

the Lieutenant on the scene, or to any of the officers at the scene, that Leigh had

instructed Garczynski to go to his car, and then turn the engine on.  Hart depo. at 43;

MacLeod depo. at 38.  Shortly after hearing the seat belt warning alarm, Leigh heard

the sound of police.  Leigh depo. at 68.  With surprise in his voice, Garczynski asked

Leigh, "Oh, you called the - you called the cops on me?"  Leigh depo. at 68.  Leigh

next gave the phone to Wildove, as she had been instructed to if she heard the police

there.  Leigh depo. at 67-69.  Wildove listened intently on the phone.  Wildove heard

Garczynski say in a "mad" tone, "don't come in here, don't come in here."  Wildove

depo. at 49, 59-60; MacLeod depo. at 42.  Wildove also heard several men yell out

several times, "show your hands!" and "drop the phone!"  Wildove depo. at 49; DE 84-

56 at 7-8.  While these commands were being given, Withrow was attempting to smash

in the front passenger side window.  MacLeod depo. at 43-44.  Once the front

passenger window was breached, Withrow smashed in the right rear window.  MacLeod

depo. at 45.  At the time of the approach to Garczynski's vehicle, Garczynski had

broken no laws of which any of the officers were aware.  Hart depo. at 26.

Four officers approached Garczynski shortly after the car started because Hart

instructed, "do not let him leave, guys."  Withrow depo. at 39; MacLeod depo. at 42;

Goddard depo. at 32, 35.  The officers believe they "couldn't allow this situation to go

mobile."  Sandt depo. at 69, 78-79, Hart depo. at 31.  The officers made a "dynamic

approach" to the vehicle which was intended as a tactical surprise to overwhelm

Garczynski so the officers could apprehend him safely.  Sandt Depo. at 79; Wildove

depo. at 53, 61.  Each officer testified as follows regarding what they saw when they

approached the car:

Deputy Rob-Roy Withrow

> My weapon was out when I approached the vehicle. [My
> weapon was in] my right hand [and my flashlight was in] my
> left hand.

Withrow depo. at 58.

> Two officers . . . were shouting commands and orders at
> [Garczynski] whom I could not see . . .

Withrow depo. at 51.

> There were a number of commands shouted which were all
> basically the same: "show us your hands.  Get out of the
> vehicle."

Withrow depo. at 55.

> I attempted to open up the [car] door. . . [M]y thought
> process at the time was that these individuals needed to
> see the individual in the vehicle.  And I'm not sure if there
> was conversation that took place between us that they
> could or could not see him.  To my recollection, they could
> not see him in the vehicle, so I felt it was important to take
> out that window so that they could now see into the
> vehicle.

Withrow depo. at 52-53

> With that I holstered my weapon, had my flashlight in my
> right hand and then broke out the window.

Withrow depo. at 58.

> I took out both side windows.  The first window was the
> passenger right front window.

Withrow depo. at 52.

> I hit the window several times, and at one point dropped my
> flashlight.  As I hit the window, it bounced out of my hand,
> so I had to grab it and step up and hit the window again,
> and it finally broke.

Withrow depo. at 54.

> [T]hen [I] put my flashlight in my left hand and redeployed
> by side arm.

Withrow depo. at 58.

> At that point, I stepped back because I still could not see
> the individual inside the vehicle.  At that point, so that I
> could then see, I then broke out the second window.

Withrow depo. at 53.

> I was asking the other officers if they could see him so we could see what he was doing, because I was very exposed at that point.  They continued to tell me they couldn't see him at that moment.  That's why I broke the second window out.  And that's when I was able to see the individual.

Withrow depo. at 55 .

> I told the individual inside the vehicle who had, from what it appeared to me, he had a cell phone in his left hand and he had his, what appeared to be an auto-loader, possibly a 9-millimeter or .45, pointed at his head with his right hand, then seated looking forward.  Then as I shouted at him, "put the gun down, put the gun down," he then turned with his cell phone in his left hand and his right arm bent with his gun pointed at his head, turned his entire body and looked at me, which – and I was to his right left possibly, if he was facing forward his 4/5:00.  He then took his weapon in his right hand and instead of dropping it to his lap, as I was commanding him to do, "put the weapon down," he then extended his arm straight in front of him and out and around and did it in a swinging motion and pointed it at me. And my belief at that time was that because of the low light and because of the flashes that were going off, that he was firing directly at me. [At that point I fired four or five bullets].

Withrow depo. at 59-60.

Deputy Dana MacLeod

> Once I saw him in the vehicle with the phone up to his head, I started giving him verbal commands, yelling at him, you know, "show me your hands, show me your hands, put the phone down, show me your hands."

MacLeod depo. at 42.

> At one point he leans forward and at that point there's a light on the building over here, you can see how it's brighter here, shined in.  I could see he had a gun to his

head.  I changed my verbalizations from "show me your hands," to "drop the gun, drop the gun," again, repeating it several times.  And at this point the window was either bursted out or already broken out and I see the gun come across and come out the window.  That's when I heard the Boca officer who fired either one or two rounds and then I was shooting.

MacLeod depo. at 47.

Deputy Shawn A. Goddard

I was in the front of the vehicle right directly in front of the windshield maintain a position of cover while Deputy Withrow was there.

Goddard depo. at 47.

After the front window was broken out, we saw the gun to his forehead.  That's when we all – I think we all pretty much observed the gun at the same time.  I heard Deputy MacLeod shout, "gun, gun, gun," and I can state for myself I shouted as well, "drop the gun, drop the gun."  I saw Mr. Garczynski had what I believe to be a cell phone in his left hand up to his ear with a blue light on it.  I saw a dark-colored handgun in his right hand pointing to his temple.

Goddard depo. at 45-46.

Mr. Garczynski brought the gun from his temple, swung around to the position of the deputies in front and the gun come around to my position.  Shots were being fired.  Deputy Withrow was still here.  I couldn't take any action because I had Deputy Withrow in my line of fire. . .  After the shots were fired, Deputy Withrow fell back.  I believed him to be shot.  The gun was still in my direction.  I believed I was going to be shot next.

Goddard depo. at 48.

I fired to stop him from shooting me.

Goddard depo. at 50.

<u>Lieutenant Jay Hart</u>

> [I was] probably 35, 40 feet [away from the vehicle and had a clear line of sight] with the vehicle. . .

Hart depo. at 49.

> [Recollection refreshed that he saw Garczynski on the cell phone but never saw his gun; that he did not see any gunfire from inside the compartment of the car; and never saw any muzzle flash.]

Hart depo. at 48-50.

<u>Officer Robert Adams</u>

> I was still giving orders to Mr. Garczynski to show us his hands and relaying what I could see in the vehicle. I could see that he had a cell phone in his left hand up to his ear, he was kind of facing forward almost leaning towards the steering wheel and I couldn't see his right hand. [After] Withrow was successful in shattering the front passenger window, . . . he raised in his right hand a gun and put it to his right temple. I ordered him to drop his weapon. I also – I believe I relayed to Deputy MacLeod that he had a gun in his hand pointing it at his head and I continued to give him orders to drop the weapon. The next thing that I can recall him doing was breaking out the right rear passenger window.

Adams depo. at 38-39.

> [Garczynski] took the weapon from his head and pointed it at Deputy Winthrow. Well, based on the fact that he was pointing a weapon at Deputy Withrow, I discharged my firearm towards him. I did not [see any gun flashes from inside the vehicle].

Adams depo. at 40-41.

If the officers on the scene had known that Garczynski was instructed by Wildove through Leigh to start his vehicle, they probably would not have approached Garczynski at that time.  MacLeod depo. at 54-57; Withrow Depo. at 45.  If he had not started the car, the team would have waited in a covert type of operation until they felt it was tactically sound and safe for them to communicate with Garczynski.  Sandt depo. at 72; McLeod depo. at 34, 38, 54-56.  If the officers had known that Garczynski was calmly speaking with his wife, that fact might have given a reason to delay the approach or deal differently with Garczynski.  Hart depo. at 51-52; Adams depo. at 27; MacLeod depo. at 34.  Garczynski turned on his engine at 1:10 a.m. and 38 seconds.  Hart depo. at 42.  At 1:11 and 52 seconds, 29 gunshots had been fired and the shooting had stopped.  Hart depo. at 42; Goddard depo. at 46.  Garczynski was hit by ten bullets.

Garczynski's gun was found on the right front passenger seat of his car after he died in a volley of gun fire.  The gun had never been fired and the weapon's hammer or slide was never locked back.  Withrow depo. at 80; DE 84-54 at 7.

Crisis intervention training is done on a voluntary basis as time is available.  Captain William Patrick Kenny Affidavit, DE 81, ¶ 5.  Officer Adams and Deputies Winthrow, MacLeod and GOddard had received little or no training in the handling of suicidal subjects at the time of their encounter with Garczynski.  In his 20 years with the Palm Beach Sheriff's Office, Lt. Hart never once used a crisis intervention person with regard to a suicide attempt and he is not aware of their usage by the police

department.  Hart depo. at 7-8.

## Standard of Review

_____A court, in reviewing a motion for summary judgment, is guided by the standard set forth in Federal Rule of Civil Procedure 56(c), which states, in relevant part, as follows:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c).  The moving party bears the burden of meeting this exacting standard.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986).  That is, "[t]he moving party bears 'the initial responsibility of informing the ... court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.' " *U.S. v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (quoting *Celotex*, 477 U.S. at 323).  In assessing whether the moving party has satisfied this burden, the Court is required to view the evidence and all factual inferences arising therefrom in the light most favorable to the non-moving party.  *Batey v. Stone*, 24 F.3d 1330, 1333 (11th Cir. 1994).

The party opposing the motion for summary judgment may not simply rest upon mere allegations or denials of the pleadings; the non-moving party must establish the essential elements of its case on which it will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322-23; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).  The nonmovant must present more than a scintilla of evidence in support of the nonmovant's position.  A jury must be able reasonably to find for the nonmovant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-252 (1986); *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).  Moreover, the Eleventh Circuit "has consistently held that conclusory allegations without specific supporting facts have no probative value."  *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985).  The moving party may meet its burden with respect to summary judgment by pointing out to the court the "absence of evidence to support the non-moving party's case." *Celotex*, 477 U.S. at 324.  "The failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial and requires the court to grant the motion for summary judgment." *Henderson v. Carnival Corp.*, 125 F. Supp. 2d 1375, 1376 (S.D. Fla. 2000).

## DISCUSSION

### Garczynski's Claim Against the Officers for Excessive Force

Garczynski can only state a claim under the Fourth Amendment against Withrow, MacLeod, and Goodard if the officers are not entitled to qualified immunity. "Qualified immunity offers complete protection for government officials sued in their

individual capacities as long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." *Lee v. Ferraro*, 284 F.3d 1188, 1193-94 (11th Cir. 2002) (quoting *Thomas v. Roberts*, 261 F.3d 1160, 1170 (11th Cir. 2001)) (internal quotation marks omitted).  Qualified immunity allows government employees to carry out their discretionary duties without fear of litigation, "protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." *Id.* at 1194 (citation and internal quotation marks omitted).

In order for the defendants to claim protection for qualified immunity, they must first demonstrate that they were engaged in a discretionary duty.  *Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004).  Because the defendants were trying to apprehend a potentially suicidal person, they were clearly engaged in a discretionary capacity.  The burden then shifts to Garczynski to show that qualified immunity is not appropriate by satisfying a two-part inquiry.  *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991).  First, viewing the evidence in the light most favorable to him, Garczynski must show that the officers violated a constitutional right.  *Saucier v. Katz*, 533 U.S. 194, 200 (2001).  If such violation occurred, then it must determined if that right was clearly established at the time of the incident.  *Id.*

"All claims that law enforcement officers have used excessive force - deadly or not - in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard."

*Graham v. Connor*, 490 U.S. 386, 395 (1989).  Therefore, an officer's use of force is unconstitutional if the force used was unreasonable under the circumstances.  The standard of reasonableness in an excessive force inquiry is wholly objective, and the use of force is constitutional if the arresting officer's actions were objectively reasonable in light of the facts and circumstances confronting the officer and without regard to the officer's underlying intent or motivation.  *Samples v. City of Atlanta,* 916 F.2d 1548 (11th Cir. 1990).  The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than by hindsight.  *Graham*, 490 U.S. at 109.

Whether the Officers Violated Garczynski's Constitutional Rights

The Estate contends that Wildove and Sandt violated Garczynski's constitutional rights by failing to convey information that would have allowed the officers on the scene to use less than deadly force when approaching Garczynski in his vehicle; and that Withrow, McLeod and Goddard did not have probable cause to arrest Garczynski because he had not committed any crime.

The Estate argues that there should have been better communication between the off-scene officers and the on-scene officers regarding, among other things, Garczynski's state of mind, because there were no exigent circumstances necessitating a dynamic approach of deadly force.  DE 98 at 6.  At the time of the dynamic approach, Garczynski was speaking calmly with his wife on the telephone, there were no imminent threats of violence towards anyone, and multiple measures

were in place to keep Garczynski from leaving.  The Estate faults Wildove and Sandt for not communicating to the team of deputies who made the approach that Garczynski was calm, and that Garczynski was instructed by his wife to start his car.

The Estate asserts that the Constitution requires that the deputies approach Garczynski in the least intrusive method, and that the seizure of Garczynski with deadly force was unreasonable and a violation of the Fourth Amendment.  DE 98 at 3, DE 94 at 10-11.  "The violent attack on his property was uncalled for as was the dynamic approach which could have only paralyzed him with fear and tension in a stark contrast to the telephone conversation in which he was trying to pull his life together again and reconciling with his wife."  DE 98 at 6.

The defendants respond that the way they approached the vehicle was justified because Garczynski had threatened suicide, had prepared documents indicating death was imminent, and had a gun.  While it is true that Garczynski was not committing a crime[3] or resisting arrest, because Garczynski had a gun, the officers on the ground did not know that he did not pose an immediate threat to himself or others at the time of the approach.

The civil rights violation the Estate argues occurred is that the officers failed to handle the situation in a particular way - they did not call in a crisis interventionist,

---

[3]  Florida does not recognize attempted suicide as a crime, *Krischer v. McIver*, 697 So.2d 97, 100 (Fla. 1997), therefore, it is impossible for this Court to measure the "severity of the crime at issue."

for example, or they did not wait until the ballistic shields arrived.  Taking the facts in

the light most favorable to Garczynski, the officers' ignorance of Garczynski's calm

state of mind and no threat status, and the style and timing of their approach to the

vehicle, at worst, was a result of negligence.  This negligent approach, as a matter of

law, does not rise to the level of a constitutional violation.  *See, e.g., Daniels v.*

*Williams*, 474 U.S. 327, 330-332 (1986) (mere negligent conduct does not "wor[k] a

deprivation in the constitutional sense").  Therefore, any claim against Defendants

regarding the way the officers approached the vehicle fails to state a violation of

Garczynski's constitutional rights.

<u>Deadly Force</u>

The Fourth Amendment's freedom from unreasonable searches and seizures

includes the right to be free from excessive force during a criminal apprehension.

*Graham v. Connor*, 490 U.S. 386, 394-95 (1989).  In determining whether the officers'

force was reasonable, it must be determined "whether a reasonable officer would

believe that this level of force is necessary in the situation at hand."  "  *Lee v.*

*Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002) (citation omitted).  Under *Graham*,

courts should determine the "objective reasonableness" of a seizure by balancing the

"nature and quality of the intrusion" against the "governmental interest at stake."

*Graham*, 490 U.S. at 396.  In this case, the intrusion was severe.  Garczynski was shot

dead by a volley of bullets from the weapons of four officers.

When determining the government's interest, the Court must consider factors that include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. Furthermore, the reasonableness of a "particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," taking into account all of the attendant circumstances. *Id*. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id*. at 396-97. In this case, since the underlying facts do not constitute a crime and Garczynski was not resisting or attempting to evade arrest, the pertinent factor for the Court to consider is to what extent Garczynski placed himself or others in danger.

The evidence in this case shows that the officers approached a vehicle that contained a person who was armed, who had threatened suicide and had prepared documents indicating that death was imminent. This was a person who did not want the police notified, and when he saw the police approach, he moved the gun from his head and pointed it in the direction of the officers. That's when the officers fired. Thus the question is - if a suicidal person takes a gun away from his own head and points it at an officer, is the officer justified in using deadly force against that person?

The answer is yes if the officer reasonably believes that the person might shoot. *Tennessee v. Garner*, 471 U.S. 1, 3 (1985).

"[T]he Constitution permits the use of deadly force . . . against a suspect who poses . . . an imminent threat of danger to a police officer or others." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1246 (11th Cir. 2003); *Kesinger v. Herrington*, 381 F.3d 1243, 1249-50 (11th Cir. 2004) (granting qualified immunity to officer who used deadly force on a suicidal victim who "posed an immediate threat of harm" to himself, the officer, and others). The officers faced an imminent threat of danger when Garczynski failed to drop the gun as he was commanded to do and pointed it at them. Judged from any perspective, the use of deadly force was objectively reasonable under the circumstances.

The Estate has no competent evidence to raise a genuine issue of material fact regarding the officers' version of what transpired during the moments of the dynamic approach. Plaintiff suggests that, because the gun was found on the front passenger seat, Garczynski could not have possibly waived the gun. Plaintiff's counsel has also mentioned in passing, in depositions and in Court, that Garczynski had defensive wounds on his arms. No evidence or argument has been presented to support these suggestions or develop their materiality. The Estate has not raised a genuine issue of material fact relating to the objective reasonableness of the shooting. No constitutional violation is present.

Failure to Establish Procedures and to Train

The Supreme Court has recognized that a local government is liable under 42 U.S.C.A. § 1983 for a constitutional violation committed by its employee if the violation is caused by the government's failure to adequately train its employees and the failure to train is the result of the government's deliberate indifference to constitutional rights. *City of Canton, Ohio v. Harris,* 489 U.S. 378 (1989) (public employers are under a constitutional duty to train employees in a way that is not deliberately indifferent to foreseeable risks of constitutional violations). Plaintiff claims that Sheriff Bradshaw's failure to establish a Crisis Intervention Program with mandatory suicide intervention/negotiation training of deputies deprived Plaintiff of his rights and privileges under the Fourth and Fourteenth Amendments.

In the instant case, since it has been determined that the police did not use excessive force and therefore did not violate Garczynski's constitutional rights, Plaintiff's claim against Sheriff Ric Bradshaw for deliberate indifference must fail and the Sheriff is entitled to summary judgment. *See Rooney v. Watson*, 101 F.3d 1378, 1381 (11th Cir. 1996) ("[A]n inquiry into a governmental entity's custom or policy is relevant only when a constitutional deprivation has occurred."); *Vineyard v. County of Murray*, 990 F.2d 1207, 1211 (11th Cir. 1993) (per curiam) ("Only when it is clear that a violation of specific rights has occurred can the question of § 1983 municipal liability for the injury arise."); *see also Collins v. City of Harker Heights*, 503 U.S. 115, 119 (1992) ("Although [§ 1983] provides the citizen with an effective remedy against those

abuses of state power that violate federal law, it does not provide a remedy for abuses that do not violate federal law."); *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point"). Because the Estate cannot establish a predicate constitutional violation, the § 1983 claim against Sheriff Ric Bradshaw in his official capacity for failure to train necessarily fails.

Liability for Torts

The last counts in the Complaint seeks to hold Sheriff Ric Bradshaw vicariously liable for assault, battery and negligence. Because Plaintiff has failed to state a federal claim against Defendants, the Estate's remaining potential state or common law claims should also be dismissed because the Court lacks jurisdiction to entertain these claims. This Court derives its authority to decide Plaintiff's federal claims from 28 U.S.C. § 1331, which provides that district courts have original jurisdiction over civil actions "arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Federal courts are given the additional power to exercise supplemental jurisdiction over state law claims which "form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). However, § 1367(c)(3) states that "[t]he district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if ... the district court has

dismissed all claims over which it has original jurisdiction ....“ Id. § 1367(c)(3).

The Eleventh Circuit has explicitly advised that a district court is well within its discretion to dismiss state law claims once the basis for original federal court jurisdiction no longer exists.  *Nolin v. Isbell*, 207 F.3d 1253, 1258 (11th Cir. 2000); *see also Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 951 n.26 (11th Cir. 1997) (“After dismissing Panama's federal claims against the ... defendants, the district court correctly dismissed its remaining state law claims against these defendants”); *Rice v. Branigar Org., Inc.*, 922 F.2d 788, 792 (11th Cir. 1991) (recognizing that trial court's decision to exercise pendant jurisdiction over state law claims is discretionary).

Here, as the Court has determined that the claims serving as the basis for original federal court jurisdiction fail as a matter of law, the Court also concludes that any potential state law claims should be dismissed without prejudice so that the Estate may, if it chooses, pursue them in state court.  Therefore, in accordance with the conclusions reached above, it is hereby

**ORDERED AND ADJUDGED** that Defendants' Motion For Summary Judgement [DE 70] is **GRANTED**.  Any claims based on state law are dismissed without prejudice.  In accordance with Fed.R.Civ.P. 58, final judgment will be entered  by separate order.

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 23rd day of September, 2008.

_____
KENNETH A. MARRA
United States District Judge

Copies furnished to:

All counsel of record